### ED. HACKWORTH, et al. v. WILLIE HACKWORTH, et al.

Eastern Section.   June 25, 1927.

Petition for Certiorari denied by Supreme Court, December 3, 1927.

1. **Wills.  The rule that the appellate court will not consider the weight of evidence applies to will cases the same as to other cases.**
   If there is any evidence to support a verdict in a will case it will not be disturbed on account of the weight of evidence as there is no difference in case of will contests from other cases in which this rule is applicable.

2. **Wills.  Evidence.  Books of account and other like exhibits may be considered as evidence tending to prove a party's handwriting is familiar in the community.**
   In an action to establish a holographic will where books of account and many other writings of deceased were offered in evidence held that they were admissible to show that the handwriting of deceased must be generally known by his acquaintances.

3. **Wills.  Evidence.  Evidence held sufficient to show deceased handwriting properly proved.**
   In an action to construe a holographic will, the evidence set out in the opinion and held sufficient proof of defendant's handwriting by his acquaintances as required by statute.

4. **Wills.  Holographic wills.  Evidence of members of the family alone that they are familiar with testator's handwriting is not sufficient to establish a holographic will.**
   Since the statute requires that before a holographic will can be established it must be shown that it is in the handwriting of the testator and that his handwriting is familiar to his acquaintances, held that members of the family cannot establish this fact by stating that they are familiar with his handwriting, but they may testify to the fact that his handwriting is familiar to his acquaintances.

**5. Witnesses.  Wills.  The credibility of witnesses is a question for the jury in the trial of a will case.**

The credibility of witnesses is a question peculiarly within the province of the court or jury trying the issues as to the handwriting, and they must determine whether the witnesses testifying to the genuineness of the handwriting are credible or not.

**6. Words and phrases.  "Acquaintances" defined.**

"Acquaintances" as used in the statute providing for the proof of a holographic will does not limit the class to people with whom testator associates or does business.

**7. Wills.  Evidence.  Evidence held sufficient to establish holographic will.**

The evidence in the instant case set out at length and held that the oral testimony together with other evidence was sufficient to establish the will.

Appeal in Error from Circuit Court, Knox County; Hon. A. C. Grimm, Judge.

Affirmed and remanded.

O. L. White, of Knoxville, for plaintiff in error.

Johnson and Cox, of Knoxville, for defendant in error.

SNODGRASS, J.  This is a contest over an alleged holographic will of Will C. Hackworth, deceased. The will gives the entire estate to the oldest daughter and the youngest son, out of a family of what had been six children.  At least all the others who had not died had left the family circle many years before, and had established families of their own.  The mother died when this youngest son was about six years old, or some thirty years before the bringing of this suit.  The daughter, Annie, had remained at home, and was practically a mother to the rest on up until they left, and to the boy, until he got married in October, 1922.  The father died in September, 1924.

The will was probated in common form in the county court.  The petition was filed to transfer the case to the circuit court for contest by Ed. Hackworth, (a son) Bertha Gallaher, (one of the married daughters) Blair Hackworth, (a minor son of a dead son, Elmer Hackworth, through next friend), S. C. Calloway, husband of Beulah Calloway, a deceased daughter, and as next friend of her minor children, William, Ellison and Carrie Blanche Calloway.  Issues were made up in the circuit court, the said two beneficiaries offering the paper purporting to be such and averring the same to be the last will of the said deceased, and the petitioners, contestants, denying that the paper was such last will and testament.

The case was tried before the court and jury, resulting in a verdict and judgment sustaining the will.  Motion for a new trial being had and overruled contestants have appealed to this court, and in addition to assigning errors with reference to the court's charge, in their first and sixth assignments they say:

"1. The court erred in overruling the motion of contestants at the end of all the proof for a verdict in favor of contestants and against the will;

"(1) Because there was no evidence to support the probate of the will;

"(2) Because the proof failed to show that the handwriting of the deceased was generally known among his acquaintances and business associates, but to the contrary."

The 6th, assignment is, that

"There is no evidence to support the verdict."

Our statute, after providing that no last will or testament shall be good or sufficient to convey or give an estate in lands unless written in the testator's lifetime and signed by him, or by some other person in his presence, and by his direction, and subscribed in his presence by two witnesses at least, neither of whom is interested in the devise of said lands, nevertheless created an exception, as follows:

"But a paper writing appearing to be the will of a deceased person, written by him, having his name subscribed to it, or inserted in some part of it, and found after his death, among his valuable papers, or lodged in the hands of another for safekeeping, shall be good and sufficient to give and convey lands, if the handwriting is generally known by his acquaintances, and it is proved by at least three credible witnesses that they verily believe the writing, and every part of it, to be in his hand." Shannon's Code, Section 3896.

The verdict of the jury has, we think, settled every issue of fact in favor of the validity of the will, and if there is any evidence to support it it may not be disturbed on that ground, as there is no difference in cases of will contests from other cases in which this rule is applicable. Crutcher v. Crutcher, 30 Tenn., 377.

There can be no doubt but what there is abundant evidence to support the finding of the jury upon every question establishing the validity of the will, unless it be with reference to the question as to whether or not the handwriting of the deceased was generally known by his acquaintances, one of the essential requisites of a holographic will. It makes no difference whether all the other essentials are established, if there is no proof to establish one of the essentials, it is just the same as if none were established, and the will would fail for that reason. Appellant in his brief states that the errors relied upon before the court below were, that there was no evidence to support the probate of the will; that the proof fails to show the handwriting of the deceased was generally known among his acquaintances, and, aside from the questions of law, we think that is the only question in the lawsuit.

The background of this litigation is, that the testator, who died in 1924, being some seventy-nine years of age, though a farmer, would

seem to have been a man of unusual activity for a man of his class and vicinity. He seems to have run a sawmill some twenty-five or thirty years ago, and apparently from his notes, books and ledgers, and the other testimony, had dealt with and employed a large number of men, principally, it would seem, in the ownership and operation of a thresher. There are accounts running through these ledgers from 1889 to 1906, and notes also to the same effect showing dealings with numerous persons for whom he had evidently threshed seed and grain, and persons with whom accounts were conducted, and it can readily and naturally be inferred from these that he dealt much also with merchants. Esquire Byington, who was and had been a Justice of the Peace for more than twenty years, a merchant in the community for more than forty years, a postmaster for eight years, and who had known the testator for thirty-six years prior to his death, and who says that the deceased attended to his own business up until a year or two before he died, knew the handwriting of the deceased and had been acquainted with it since 1877. The deceased he said had written orders for groceries to his store, was a pensioner and had signed pension checks for years; that deceased had worked on his own pension case, got up evidence for himself, and procured pay for helpless soldiers a year or two. He testifies· that the entire will was in the handwriting of the deceased.

The next witness, Mr. Thompson, a school teacher, was familiar with his handwriting. It is true when he was asked the direct question "did you become acquainted with his handwriting," his reply was, "Well, to some extent, yes." He said he had carried the mail on Byington Route 1 for three years and eight months, and during this time saw the testator nearly every day through the week, and had talked with him about like a mail carrier talks in passing to those whom he served. He had taken him letters and received letters from him to take away from his home. He stated, as another reason for his familiarity with his handwriting, that "three times a year there was a colored woman in the community that drew a pension, and she could not write her name, and she had a minor child, and she drew, and also the child drew, a pension of two dollars per month from the government, and in getting this pension the check was all put together to the old lady, old Aunt Beckey Hardin and her minor child, and because of the fact that she could not write her name, and the pensions coming together, and she handled the money for the child, she had to sign a voucher each three months, each quarter, and she always met me at the Hackworth's with the paper, and mail carrier filled out the paper, what was to be filled out, and it was signed with her mark, and Mr. Hackworth and Annie Hackworth always witnessed it, and wrote their names in two places, with their address, Byington, Tenn., Route 1; the full name and middle initial must be written in pen and ink, and that was done each three months,

with the exception probably of two or three times." The witness saw the testator write his name on these occasions. While he did not see him write the address on letters given him to mail, the signatures that he signed for the old woman resembled in outline the handwriting of the letters given him to mail. He was shown the paper purporting to be Mr. Hackworth's last will and asked whether or not he recognized it as being his handwriting, "signed down there William C. Hackworth," and he said: "It looks like it, all right." And to the question, "to your best knowledge and belief is that his handwriting," he replied: "I believe it is, yes, I would not dispute it."

The testimony of Dr. A. R. Garrison, his family physician was taken, and he was asked the question:

"Q. Were you acquainted with his handwriting?" A. I would not say that I was absolutely familiar with his handwriting, except I had occasionally seen his signature."

He was shown the will and asked to state whether or not in his judgment and belief it was in his handwriting, and he said:

"I have never been so very familiar with his handwriting, except have seen his signature, and that appears to be his signature."

He stated that the handwriting in the will and the signature were quite similar. On cross-examination he was asked:

"Q. Still you admit that you were not really, not so well acquainted with his handwriting?" A. I could not say that I am an expert in handwriting. I will just say this: I have occasionally seen his signature, because I had filled out some pension papers for him, and saw him sign his name to them, and also I have seen him sign his name at the lodge, is about the most I ever saw of it."

He said he did not see him sign his name at the lodge, but saw the signature and supposed he did. But asked if he based his familiarity with the handwriting on the signature on the lodge record, he said he had a few times written him a little note in regard to some medicine and signed his name to that; that he did not see him write the note, but presumed he had done so; that of course he could not swear to any man's signature absolutely and without doubt unless he saw him sign it, but to the best of his knowledge of course it was his signature. Asked if he was not a witness in the probate of the will, and if he had not made the statement that he believed he had made a mistake, he replied: "I made the statement that I felt like I might have had more hesitation. I looked at the signature, and after I had seen my name on the back of it I did feel that there could be a mistake, so I went home and found an affidavit in my desk that he had made, a compensation affidavit, and I compared it to this, and they are the same." He produced and filed the affidavit as Exhibit A to his deposition. He stated further:

"In regard to the signature on the will there, of course I studied the matter over and felt like it was a great deal to say. I swore to the best of my knowledge and belief it was his signature, but after I found that affidavit at home it made me feel better about it. I didn't want to be mistaken about it." He was asked:

"Q. State whether or not after verifying your judgment by the affidavit you still verily believe that the will is in his handwriting?" A. To the best of my knowledge."

"Q. What about your belief? A. I didn't see him sign it, I didn't see him write it.

"Q. What about your belief? Do you verily believe that is in his handwriting, that will? A. It is evidence more than any I have seen.

"Q. Do you believe it? A. I believe probably it is. Of course I could be mistaken, I will say to the best of my knowledge.

"Q. What about your belief, Doctor? A. That is what I say, I said I believed to the best of my knowledge: of course I would not swear to my own signature, and I would not swear to anybody else's unless I am positive and not a doubt, I would not do that." He said further:

"You know it is an easy matter sometimes to be mistaken. Of course I don't mean to cast any reflections on this, or say it is a fraud, or anything of the kind, but a man ought to be on his guard."

While this evidence indicates great caution on the part of the Doctor, we think it evidences an acquaintance of the Doctor with the handwriting of the testator, and that he verily believed the writing of every part of it to be in his hand.

W. E. Keller had lived in the vicinity of the testator about four years; had been to California and had received letters from the testator. They corresponded. He had seen his handwriting from time to time during the four years he had lived out there, and knew it. He was shown the will and asked if it was entirely in the handwriting of the testator, and his answer was: "Yes, I believe that is in his handwriting."

Robert Kelley was introduced. He was a man who could not read and write much; could not read the will, regarding which he said: "A man that will read that, he has to have a pretty good education to make it out perfect, and he hadn't had much change of an education." He said he would make out his own bills and sign his name to them. The will was shown him and he was asked whether or not in his judgment and best belief it was entirely in the handwriting of the testator. He said: "It looks like some I have seen him do, something like— looks like something I have seen—it represents it." He said he had

seen him write in their business; that he would make out orders for supplies. He was asked:

"Q. State whether or not to the best of your knowledge and belief that is entirely in his handwriting? A. Yes, I believe that he done this, according to what I have seen before. Now I would not be positive to nothing except what I see a man do with my own eyes; that is my best belief that he done it."

On cross-examination he said he had worked for the testator; had done a little of most everything about the place; did some carpenter work, and that was when the testator had given orders that he spoke of, and all along up until the time the last was, and it was from these orders that he had formed an opinion as to his handwriting.

Mrs. Dessie Wilmott, a widow, had lived in the vicinity her whole life. Had lived above Byington twenty-three years, and in Byington ten years. She had worked in the Trustee's office, and had been Post Mistress eight and a half years in Byington, from May 15, 1914 to sometime in October, 1921. Prior to this had taught school. She had known the testator all her life, and was thirty-three years old. Since her sister had been in the testator's house she had seen the testator most every week. Her sister married proponent, Will Hackworth. She states she was familiar with the handwriting of the testator during these years ever since she was in the post office, where she went in May, 1914. She came in contact with his handwriting during the whole time she was there. She was shown the will and asked to state whether or not in her judgment the will was entirely in the testator's handwriting, and her answer was, "yes, I do."

"Q. Do what? A. I do say this is in his handwriting."

"Q. All of it? A. Every bit of it.

The testimony of Annie Hackworth, one of the proponents, is that she would be fifty-two years old in coming February; that she had never married; that she had been nervous the past two years, and had not been off the place since her father died but once or twice; that she was not able to go to the court house; that her father died in September, 1924, in the house where her deposition was being taken; that her mother had been dead for thirty years; that she had lived with her father after her mother died; that there were several of the children, but that she had been the longest with him; that she had taken the place of mother; that she and her sisters did the washing, but that Beulah, who married Calloway, had been away from home more than twenty years, and that Bertha, who married Gallaher, had been away twenty-four years; that the boy had married and left home sixteen or seventeen years ago; that a girl they raised had married and gone away ten years ago. She was shown the will and said it was his writing; testified that her father told her he was going to make a will; that he was going to fix up his business, and he was

going to make everything to Willie and her, that all the rest of the children had married and left; that she and Willie had stayed with him; that he said if Willie had not helped him he did not know when he would have gotten out of debt; that she never spoke to him at any time about making a will in her favor; that he brought up the question without either her or Willie suggesting it. She said the paper writing shown her was entirely in the handwriting of her father, and filed it as exhibit to her deposition; that the entire will was in his usual and ordinary handwriting. She testified that after his death she found it in his papers, within just a few days; it was in the drawer with his papers, with deeds and money receipts and things like that, tax and all kinds of receipts, and mortgages, etc. She said she saw her father writing the will; that he spoke about it the same day he wrote it. On cross-examination she stated that it was March 20, 1922; that it was in the room; that she and Willie were present and saw him; that she put the will away for him; that she saw it again among these papers before he died; that it was among these papers all the time and was not taken out before he died after it was put away; but after his death she found it there and told Willie where it was. Later a portfolio containing deeds, mortgages, notes, receipts, daybooks, account books, etc. were filed, and are in the record. Miss Hackworth was asked about these papers as follows:

"Q. Whose papers are these in this portfolio, where your father told you to place his will?

She replied that they were his and not hers, and that when her father got done writing the will he handed it to her to put it in the portfolio with his other papers; that the portfolio with his valuable papers was in the room where she, Willie and he stayed; that he had access to it and it was where he could go back and get it at any time; that he did go back and put papers in it after he wrote the will; that she put the will right where he told her to put it, in the portfolio; that he had no other portfolio but this, and that he kept no valuable papers anywhere else that she knew of.

Mr. J. J. Jones was introduced and interrogated about the soundness of mind of the testator, but no question is made here as to that matter. On cross-examination he stated that the testator was a member of the Masonic fraternity, and that he had met him there once a month for fifteen years; that he visited him in his home in the summer before he died the following winter: that he was jolly, very much delighted that he had come; that they had no business dealings that amounted to anything much, except threshing; that he might have sold him some corn, but no great deal of dealings other than to do his threshing; that he never saw his handwriting.

Mrs. Willie Hackworth testified that she and her husband were married in October, 1922, after the will was written; that she knew

the family before their marriage; that she had known the testator all her life; she was raised in that community and before her marriage was a daughter of Tom Calloway. She had been Assistant Post Mistress at Byington when Mrs. Wilmott was Post Mistress; had opportunities to observe the testator's handwriting and was acquainted with it. She was asked:

"Q. State whether or not his handwriting was generally known in that vicinity among his acquaintances? A. I would say that it was."

She was present when the will was discovered or found after his death. She was shown the will and asked if she was sufficiently familiar with his handwriting to state whether or not it was entirely in his handwriting, the whole will, to which she replied: "Yes sir." She was then asked:

"Q. Is that will entirely in his handwriting? A. I would say that it was."

She also testified that it was found within the portfolio, and that it was just exactly as it was when she saw the will in there, and that it was two or three days after his death. She filed the portfolio as exhibit to her testimony, and stated there was in it valuable papers, mortgages, deeds, receipts and notes; that the portfolio was in the testator's dresser drawer in the room where he stayed, and that the papers were his papers. She filed testator's account books, threshing machine accounts, daybooks and other exhibits, testifying that they were in his handwriting; also the bylaws of Beaver Ridge Lodge, and identified his name thereon as the signature of the testator. A letter purporting to be signed by the testator, which she identified as his writing and signature, was filed as Exhibit "N" to her testimony. She identified and filed some notes as Exhibit O, P, Q, R, S, T, U, V, and identified the signature on them as the genuine signature of the testator. The dates of these exhibits range from 1889 to 1907, and possibly later.

W. B. Cobb was examined along the line of the testator's sanity. On cross-examination he stated that while the testator had done threshing for him he was not acquainted with his handwriting; that he never saw it that he knew of.

Willie Hackworth testified that his sister was not able to come to court; that she was not able to do anything, and had not been stout for several years; that he was the youngest boy and had lived there on the farm with his father all his life, and he was thirty-seven years old; that he and his sister were there, but part of the family were dead, and the rest were married and lived away; none at home; that he, his wife and his sister were the only ones now living on the farm; that after his mother died his sister did all there was to do in looking after the family as long as she was able; that he worked there on the farm with his father; they worked together; "I just

kinder worked the farm, and we kinder worked through one another;'' that his father had been in debt, and that he assisted him all that he could; that he kept no books more than when he ran the threshing machine and such like as that, but did attend to his business, and—''what he said I done.'' He said he was in the room when his father wrote the will; that he noticed him writing, but did not know what he was writing; that he never spoke to him about it; that he went out, and either the next day or the next day or two, as well as he remembered, he would not be positive. ''Annie says to me, says—Objection was made, and upon another question he said that he never mentioned a word to him about the will, but after his father's death Annie was sick in bed, and she told him where the will was among his papers, and he went and got it for her; that he found the will in the portfolio that was filed among his father's valuable papers; that they looked it over, that he did not know anything about the will, what to do with it, and that they suggested that they take it and show it to Esquire Byington, and that he did, and he took it and looked at it, and, as well as remembered, said: Objection was made, and he was then asked:

''Q. Look at this paper and say whether or not that is the will you found in the portfolio?'' And he answered, ''it was.'' He was further asked:

''Q. Is that will in your father's handwriting, or somebody's else? A. In my father's handwriting.''

And he stated that it was all in his handwriting. He said his father was a man that wrote often.

Mrs. Barkshadt was the next witness. She was examined along the line of soundness of mind of the testator, and was not asked as to his handwriting.

The will itself was then introduced and read, and appears as follows:

''(Byington March 20 1922
this is Mi Last will
Bequeath an devise to
Anie Hackworth
an Willie Hackworth
in Complete and Perfect
onership all mi Rights and
Property of every Kinde
and natuar whether Real
Personal or Mixed
Wherever situated Appointing
Anie B. Hackworth
Willie Hackworth
Executers of Mi My Estate

with out Bond and
Giving them Seizure
there off when I am done with
it          Will C. Hackworth)''

Contestants' proof was of course controversial, tending to cast suspicion upon the will and to establish that it was a forgery and a concocted scheme between the two proponents to get the 131 acre farm and cut them out of their inheritance. They examined some ten or a dozen witnesses, nearly all or most of whom were not acquainted with the testator's handwriting.

J. C. F. Harrell stated that if he had ever seen any of the testator's handwriting, any more than his signature, he did not know it. This witness it seems had testified under the original probate, and he was asked:

"Q. Can you state now whether or not that will is in the handwriting of Mr. Hackworth? A. This is the same matter, is it?"

"Q. Yes. A. I will state what I stated down there. I told the clerk when he wanted to qualify me to it that the signature looked like Mr. Hackworth's writing, but the other I could not say; and would not say; and would not say now.''

This witness at least seems to have been familiar with his signature.

The next witness was A. S. Garrison, who was fifty-two years old and knew the testator all his life, but had scarcely had any dealings with him. Back, however, twenty-five years, he had worked for C. R. Love & Co. and Greer Machinery Co., and had sold the testator fertilizer and some machinery. He guessed he had seen his handwriting, but could not say, it had been so long, but thinks at that time he possibly signed some orders, and some he had asked the witness to just sign. He said he had seen his handwriting, but guessed he would not know it now; would not be sure about that. He was then asked by counsel for contestants:

"Q. State whether or not his handwriting was generally known in the community there?"

Objection was made to this, but after argument as to whether or not the witness could know what others might know, the objection was overruled and the witness answered:

"A. His handwriting I guess, is known possibly over the neighborhood, but I would not know his handwriting myself, except my father's handwriting, his initials are J. H. Garrison, and I remember Mr. Hackworth made an "H" like his "H," but I could not identify the handwriting; I don't think I could do that at all. He signed his name W. C. Hackworth I think mostly.''

The next witness, Joe Coward, knew the testator well, but never saw him write.

Sam Calloway knew him twenty years; never knew anything about his handwriting; never saw him write.

Winfield Cobb was in the threshing business with the testator and his brother many years ago, but never saw him write a line in his life; never knew whether he could write or not. There had been occasions to give orders; he had run the river with him twenty-five years; there were orders for grub to be made out, and he never saw testator write a line in his life.

Fred Cox married the girl that Hackworth raised; knew him all his life; never saw him write. He had a note once with testator's name on it, but did not know who wrote it.

Mrs. Willie Gollaher, a daughter of the testator, testified that from the age of twelve to twenty-one, when she left, she did the testator's writing. She said he had "a right smart to do." Claims to have written the orders that witness Kelley got. She testified that she never saw her father sign notes and papers, unless it would be to sign his name, of course. Had seen him sign his name to deeds. She said her father never wrote the will; that it was not his writing. She claims her father's hands were stiff; that they shook and he could not write; that the thumb and forefinger and little finger were torn off, and that it was affected with rheumatism ever since she could remember; that as he got older it got worse; that her father called upon her to write because he just could not write. On cross-examination she stated it was the left hand that the fingers were off, but that his right hand was stiff and he could not open it.

Bud Yarnell said he knew the testator all his life; was in business with him about ten years, threshing machine and sawmill. Had seen him sign his name to notes when they would buy anything on credit, about three times he supposed. Never saw him do any other writing that he recollected.

Joe Hackworth, nephew of the testator, had known him all his life. Was with him quite a bit; had worked for him; went with him one season on threshing machine and worked some on the farm, but if he ever saw any of his writing he did not know it; never saw him write.

Wiley Luttrell, teacher of penmanship in Knoxville Business College, had taught penmanship for twenty years; made a study of it several years; had testified in forgery cases a few times and made a study of handwriting, and it had been a part of his work and practise to make comparisons of handwriting for a number of years; compared signature on will with other signatures on notes, etc., and said he saw some difference between the signature on deed and the signature appearing on the will. He was asked:

"Q. In the comparison of the handwriting in the will with the handwriting in the daybooks which I have shown you, and the notes to which his genuine signature is signed, state whether or not in your opinion it is the same handwriting? A. No, it does not appear to be the same handwriting."

He testified that making a general comparison of the will with the writing in the daybooks it does not seem to be the same; that the handwriting of the will appears to be smaller than the handwriting in the daybooks.

Will Gallaher married one of the daughters. He had seen some of the testator's writing. He had signed one note for him, and one petition, and wrote one letter about thirteen or fourteen years ago. He had examined the purported will, and said the writing therein was a better handwriting than what he signed this note and the petition for him. He was asked:

"Q. If I show you some of his writing on notes, would you recognize that? A. I would with a pencil, I believe."

He was shown a note dated May 30, 1903 for $4.32, signed with pencil, and asked:

"Q. Is that his signature? A. The W. and C looks a good deal like Mr. Hackworth wrote it."

"Q. I show you another dated December 1, 1920, for $4.30. Whose signature is that? A. That is his signature."

He was shown others; some he thought looked like it, but could not testify that it was.

Ed Hackworth, a son, had never seen his father do but mighty little writing, and did not know that he would know his handwriting; had been living away from home for twenty-four years, but came back every chance he got; half a dozen times a year since he moved where he is now. He testified that some of his sisters generally always did his father's writing; that Willie had told him after his father died—(they were out in the yard) that Willie said: "Well, papa left a little note saying he wanted Annie to stay on the place as long as she lived," and that that was all he said about it, but that later on, in about two or three weeks, he was down there again, and that he told him his father had left a will; that he asked him who he willed it to, and he said: "He willed it to me and Annie."

Mrs. Willie Hackworth was recalled, and stated that she had seen W. C. Hackworth writing there about his house previous to his death; that his left hand was injured, but he wrote with his right hand; that the will was in the handwriting of Will C. Hackworth, and that Columbus Hackworth, his brother, had died September 16, 1920.

We have given a pretty full synopsis of the evidence on the material questions, from which we are of opinion that there is evidence to support the verdict of the jury, whose province it was and is to settle the facts. As stated in the outset, the real controversy was over

the question as to whether or not the handwriting of the deceased was generally known by his acquaintances. On this point the exhibit account books and testimony indicate that many years ago this farmer, the testator, did a sawmill work, and also a somewhat extensive threshing business among the farmers of that section, many more than were introduced, and of those introduced many lived during this period. Such of these as Byington, (the merchant, J. P. and Post Master) Thompson, (a school teacher and erstwhile mail carrier) Dr. A. R. Garrison, W. E. Keller, (a one time neighbor) Robert Kelley, and Mrs. Dessie Wilmott, (former employee of the trustee's office and Post Mistress) all evinced familiarity with his handwriting, though a few of the witnesses introduced were not acquainted with it. Of the twelve witnesses introduced by the contestants, some were familiar at least with his signature. J. C. Harrell was a witness to the original probate and evinced some familiarity with his signature, and stated in response to a direct question by counsel for contestants that "his handwriting is known possibly over the neighborhood." Bud Yarnell saw him sign his name to notes. Will Gallaher had seen him sign his name for him to one note and one petition, and testator had written him a letter. He evinced a familiarity with the testator's signature at least when he would sign with pencil. Mrs. Willie Hackworth also testified in reply to the direct question "state whether or not his handwriting was generally known in that vicinity among his acquaintances," that "I would say that it was."

It is insisted by counsel for contestants that the record impeaches Mrs. Willie Hackworth, but we cannot see that it necessarily does, or that the jury, whose province it was to weigh her testimony had not given her credence. It is likewise insisted that her evidence was not competent to prove that fact, but we think that it was. At any rate the evidence was not objected to, and no assignment is made that it was improperly received. It may be true that in determining the question as to whether or not the handwriting was generally known by his acquaintances purely as an inference from the statements of those who testified that they knew it, that such statements by members of the family that they know his handwriting is not sufficient to support such inference, and that in this respect they are not included in the term "acquaintances." But it would not follow from this that if as a matter of fact his writing was generally familiar to his acquaintances, that the fact might not be testified to by a daughter-in-law, who was then a member of the family. She is not disqualified merely by interest to prove other essential facts, i. e., that the will was wholly in the handwriting of the testator, and that it was found after his death among his valuable papers.

"An interested witness is competent, (Franklin v. Franklin,

6 T. A.—30.

6 Pickle, 44-48) and if credible, notwithstanding his interest, he may be one of the three witnesses to prove the handwriting. But if his interest renders him incredible in the judgment of the court or jury trying the issue, he cannot be one of such three witnesses'' Note 42 to section 3896, Shannon's Code.

It is true that in the case of Franklin v. Franklin, supra the will was that of personalty, but there is no difference in principle. This same note just referred to digests the law to be that

"The credibility of witnesses is a question peculiarly within the province of the court or jury trying the issues as to the handwriting, and they must determine whether the witnesses testifying to the genuineness of the handwriting are credible or not.''

The jury and the court having found in favor of the credibility of this witness, the matter is no longer open here in this case.

In this connection also, it is manifest that the special request contained in the fourth assignment was improper, in that this testimony of the daughter-in-law was not authorized to be eliminated in determining the question as to whether or not the handwriting of the testator was generally known. The Circuit Judge was therefore not in error in refusing it.

The special request set out in the third assignment was, under the facts of this case, an inaccurate statement of the law, and therefore properly declined. The request assumed, notwithstanding the number of witnesses of testator's acquaintance outside of the family who testified as to a familiarity with his handwriting, that it would require a larger number than these to guarantee against the perpetration of a false will. Besides the request limited the class to which handwriting must be known to associates, and those with whom he did business, whereas the statute enlarges familiars to "acquaintances.'' A man may be acquainted with those with whom he neither does business nor associates, and these acquaintances may nevertheless know his handwriting. In the case of Cliburn v. Mynatt, (2 Shannon's Cases, 50) it does not appear how many acquaintances testified as to a knowledge of the testator's handwriting. At best it was decided that the evidence appearing did not show that the handwriting of the deceased was generally known; that the term "acquaintances'' was more comprehensive than to embrace merely the family of the decedent, to whom it was not meant to apply; but the statement of the court that it "refers to such persons as usually associated or transacted business with the testator,'' was a contraction of the terms of the statute. It does not appear to have been necessary in the determination of that case, and is therefore dictum.

The case of McCutchen v. Ochmig (60 Tenn., 390) went off on the question of the lodgment for safekeeping, the court stating that

"we are of opinion that it does not sufficiently appear in the proof that the script in question was lodged with the plaintiff by the deceased for safekeeping as his will." However, in the discussion of that case they referred approvingly to an old case of 1 Jones (N. & C.) R. 150, which held that "generally known may be inferred from its being testified to by a large number of witnesses," though under the authority of Cliburn v. Mynatt (supra) this large number of witnesses from which such inference may be drawn may not be constituted of the testator's family.

It was held in the case of Tate v. Tate (30 Tenn., 467) that the fact that the handwriting is generally known may appear from facts and circumstances as well as by direct proof, and it is insisted by proponents that the documentary evidence on file in the twenty-seven exhibits in the case shows conclusively that Will C. Hackworth had been in business of such character as to bring his handwriting frequently before his acquaintances. While these exhibits may not show this fact beyond the shadow of a doubt, as insisted, yet they are circumstances to be looked to in connection with the number of outside witnesses who so testified; and when taken with the statements of the two witnesses, Mrs. Willie Hackworth and A. S. Garrison, that it was so generally known in the manner stated by them, we think the case presented evidence to support the finding of the jury, as stated hereinbefore.

The special request as specified in the second assignment was also inaccurate. Its first paragraph had, though not perhaps in exact language, been substantially presented to the jury in the court's charge. It was not necessary to state to them the reason of the law. The second paragraph undertook to define what is meant by "acquaintances" to be "those who usually associated or transacted business with the testator," which we think has been shown in a previous consideration to be an unauthorized contraction of the term. Moreover we think this special request would have entirely eliminated Mrs. Willie Hackworth's testimony that his handwriting she thought was generally known.

The fifth assignment is, that the court erred in refusing to submit the following special request to the jury:

"The handwriting must be so well known as that if a false will be prepounded for probate it would be in the power of the persons interested in the estate to expose and defeat it by the proof of other witnesses.

"The fact that the handwriting is known may appear from other facts and circumstances as well as by direct proof, as if the deceased had been in business of such character as to bring his handwriting frequently before his acquaintances, it might be inferred from this, in aid of other proof, that they were generally acquainted with it; but if he seldom wrote, and his writing

is irregular and imperfect, and seldom before the observation of his acquaintances, such inference would not arise, but to the contrary.''

Properly guarded there was evidence entitling contestants to have had the second paragraph of the request submitted to the jury as in so far as there was any reliance upon an inference purely to establish the fact of general acquaintance, the contestants would have been entitled to have had the last paragraph given in charge as an intelligent explanation of rules governing inferences that might be drawn. However, without regard to an inference to be drawn from the character of business, there was some direct proof that the handwriting was generally known by his acquaintances, in addition to the inference that might be drawn from the number of witnesses who testified personal familiarity with the handwriting. Without modification, and as applied to the proof in this case, it would have been error to have told the jury if they should find that ''he wrote but seldom, and his writing was irregular and imperfect, and seldom before the observation of his acquaintances, such inference would not arise, but the contrary.'' In other words, that the presumption would be, that it was not generally known. To have made it applicable it should have provided against the danger of withdrawing from the proper consideration of the jury this other evidence, especially the direct proof referred to.

The language of the law, which may be accurate as applied to a particular case, may become inaccurate when attempted to be applied to another of more comprehensive facts. The special request was taken from the case of Tate v. Tate, supra, which went off mainly on the court's charge, from which it would also appear that there was no direct proof of the handwriting of the testator being generally known. The court said:

''In the present case it is fairly inferable from the proof that the handwriting of the deceased was generally known (whether by the number of witnesses who testified, or whether by the character of the business in which he had been engaged, bringing his writing frequently before his acquaintances, does not appear) by his acquaintances and, in this respect, no exception can be taken to the charge.''

Without being confined the special request went too far in its scope, and therefore the Circuit Judge could not be put in error in its declination. Moreover this paragraph of the request was coupled with another containing the court's reasoning, couched in such dogmatic phrase, as if adopted, it seems to us, would be not simply an explanation or interpretation of what is meant by the sentence of the act ''if the handwriting is generally known by his acquaintances,'' but to impose upon it a legislative construction of such impossible

precision that no one could reasonably say or determine in advance of the report of a jury when the law was complied with. It is true that in the case of McCutchen v. Ochmig, (supra) the case of Outlaw v. Hurdle, 1 Jones, (N. & C.) R. 150 is referred to as holding "under a like statute, that to entitle a holographic will to probate, the handwriting of the deceased should be so generally known as to preclude the attempt to establish a fabricated will." We have not been able to see this case to determine whether the facts authorized it to be thus established as a rule. However, it would seem to be more difficult of application as a working principle than the dictum in the case of Tate v. Tate, supra, for how could general knowledge of the testator's handwriting, however well spread, preclude the attempt to establish a fabricated will? It is common knowledge that attempts to foist spurious documents cannot be prevented. The statute does not undertake to prevent them, nor to guarantee their defeat if attempted. If any definition were attempted other than what the statute says itself, at best we think it should go no further than to say, the handwriting should be so well known by his acquaintances as that an attempt to fabricate a will as his would not likely be undertaken, and that, if so attempted, a fair chance to contest it would exist by witnesses who were acquainted with his handwriting.

The proof does not show the value of the farm in the locality in which it is situated. There appears from the proof to be a very substantial reason as to why the father should have left the farm to these two children. The daughter, Annie, was unmarried, fifty-two years of age, and her health was declining. There rested upon him because of the circumstances of this case the obligation to provide for her declining years, as apparently she, more than all the rest, had borne the burdens of his household, and had special claims upon his generosity. The younger son, too, had stayed upon the land and worked with him, and aided him in the discharge of his debts. The others had gone away from the home many years before and established home of their own. We think a sufficient reason existed for the disposition of the property that seems to have been made.

Upon the whole we are satisfied that no reversible error appears in the case. The assignments of error are all overruled, and the judgment of the lower court affirmed. The will will be certified to the county court for record. The costs of the cause are adjudged against contestant appellants and their securities on the appeal bond.

Portrum and Thompson, JJ., concur.